1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MONTEZ DELANO BAKER,

        Petitioner,

           v.

KOMIVES
NICK LUDWICK,

        Respondent.

_____/

CASE NO. 2:10-CV-10774
JUDGE VICTORIA A. ROBERTS
MAGISTRATE JUDGE PAUL J.


## REPORT AND RECOMMENDATION


I.    RECOMMENDATION: The Court should deny petitioner's application for the writ of habeas corpus. If the Court accepts this recommendation, the Court should also deny a certificate of appealability.

II.    REPORT:

A.    *Procedural History*

1.    Petitioner Montez Delano Baker is a state prisoner, currently confined at the St. Louis Correctional Facility in St. Louis, Michigan.

2.    On May 21, 2007, petitioner was convicted of first degree premeditated murder, MICH. COMP. LAWS § 750.316(1)(a); stalking, MICH. COMP. LAWS § 750.411h; felon in possession of a firearm, MICH. COMP. LAWS § 750.224f; and felony firearm, MICH. COMP. LAWS § 750.227b (second offense), following a jury trial in the Wayne County Circuit Court. On June 7, 2007, he

was sentenced to a mandatory term of life imprisonment without possibility of parole on the first degree murder conviction, concurrent terms of 1 years' imprisonment for stalking and 2 to 5 years' imprisonment for possession of a firearm by a person convicted of a felony conviction, and a mandatory consecutive term of 5 years' imprisonment for felony firearm conviction.

3.      Petitioner appealed as of right to the Michigan Court of Appeals raising, through counsel, the following claims:

I.      MR. BAKER'S CONVICTION OF FIRST DEGREE MURDER AND HIS FIREARM CONVICTIONS SHOULD BE REVERSED BECAUSE THERE WAS INSUFFICIENT EVIDENCE TO SUPPORT THEM. NO PHYSICAL EVIDENCE LINKED MR. BAKER TO THIS CRIME, NO EYE WITNESSES TO THE SHOOTING, AND THE ONLY PERSON TO ACTUALLY CLAIM HE SAW MR. BAKER IN THE AREA ONLY SAW HIM FOR A MATTER OF SECONDS IN A DARK ALLEY AND COULD NOT DEFINITIVELY SAY HE SAW AN ACTUAL FIREARM.

II.     MR. BAKER IS ENTITLED TO A NEW TRIAL BECAUSE THE ADMISSION OF STATEMENTS TAMIKO ALLEGEDLY MADE TO THE POLICE VIOLATED HIS CONSTITUTIONAL RIGHT TO CONFRONTATION. THE TRIAL COURT ERRED IN ITS APPLICATION OF THE FORFEITURE BY WRONGDOING DOCTRINE

III.    MR. BAKER WAS DENIED HIS RIGHT TO A LIVE LINEUP WHEN OFFICER THOMAS CONDUCTED A PHOTOGRAPHIC SHOW UP EVEN THOUGH MR. BAKER WAS IN CUSTODY AND OFFICER THOMAS KNEW OF HIS LOCATION.

IV.     THE TRIAL COURT ABUSED ITS DISCRETION BY DECLINING TO GIVE A MISSING WITNESS INSTRUCTION WHEN THE PROSECUTION FAILED TO PRODUCE TWO WITNESSES FOR TRIAL AND ONE OF THE WITNESSES WAS IN A FIGHT INVOLVING A GUN

2

LESS THAN AN HOUR BEFORE TAMIKO WAS SHOT.

The court of appeals found no merit to petitioner's claims, and affirmed his conviction and sentence.   *See People v. Baker*, No. 278951, 2008 WL 4762776 (Mich. Ct. App. 2008) (per curiam).

4.         Petitioner, proceeding *pro se*, sought leave to appeal these four issues to the Michigan Supreme Court.  The Supreme Court denied petitioner's application for leave to appeal in a standard order.  *See People v. Baker*, 483 Mich. 1111, 766 N.W.2d 813 (2009).

5.         Petitioner, proceeding *pro se*, filed the instant application for a writ of habeas corpus on February 25, 2010.   As grounds for the writ of habeas corpus, he raises four claims.

> I.         MR. BAKER IS ENTITLED TO A NEW TRIAL BECAUSE THE ADMISSION OF STATEMENTS TAMIKO ALLEGEDLY MADE TO THE POLICE VIOLATED HIS CONSTITUTIONAL RIGHT TO CONFRONTATION.
>
> II.        MR. BAKER'S CONVICTION OF FIRST DEGREE MURDER AND HIS FIREARM CONVICTION SHOULD BE REVERSED BECAUSE THERE WAS INSUFFICIENT EVIDENCE TO SUPPORT THEM.
>
> III.       MR. BAKER WAS DENIED HIS RIGHT TO A LIVE LINEUP WHEN OFFICER THOMAS CONDUCTED A PHOTOGRAPHIC SHOW UP EVEN THOUGH MR. BAKER WAS IN CUSTODY AND OFFICER THOMAS KNEW OF HIS LOCATION.
>
> IV.       THE TRIAL COURT ABUSED ITS DISCRETION BY DECLINING TO GIVE A DUE DILIGENCE INSTRUCTION WHEN THE PROSECUTION FAILED TO PRODUCE TWO WITNESSES FOR TRIAL AND ONE OF THE WITNESSES WAS IN A FIGHT INVOLVING A GUN LESS THAN AN HOUR BEFORE TAMIKO WAS SHOT.

5.         Respondent filed his answer on September 21, 2010.   He

3

contends that petitioner's claims either are without merit or are state law claims which are not cognizable on habeas review.

6.         Petitioner filed a reply to respondent's answer on December 3, 2010.

B.    *Factual Background Underlying Petitioner's Conviction*

Petitioner's conviction arose from the shooting death of his estranged wide, Tamiko Singleton (Tamiko).   The evidence adduced at trial showed that she was found dead in the driveway of 5074 Buckingham on August 10, 2006.   (TT, 5/15/07, 58; 5/16/07, 88; 5/21/07, 6-7).   The cause of death was determined to be a single shot to the head indicating homicide.   (TT 5/16/07, 6).

Tamiko had moved out of the residence she shared with petitioner and later filed for divorce in July 2006.   (TT, 5/15/07, 120-121; see also 5/16/07, 14-15).   Valencia Coston (Coston), who had known Tamiko for over ten years, testified that her friend's appearance and demeanor changed over the course of her relationship with petitioner.   (TT, 5/15/07, 9-11).   Specifically, Coston stated that Tamiko was once an outgoing and happy woman, but after her relationship with petitioner began, she became depressed and lost a lot of weight.   (TT, 5/15/07, 9-11; see also 5/16/07, 20-21).

Tamiko's mother, Patricia Singleton (Singleton), testified that her daughter moved out of her home with petitioner and filed for divorce because she was sick of the beatings and abuse.   (TT, 5/16/07, 16-17).   Singleton also

4

testified that petitioner would peep inside the windows and doors of her home and would grin.  (TT, 5/16/07, 17-18).  Further, she testified that she heard petitioner threaten the life of her daughter.  (TT, 5/16/07, 18, 20).

On August 9, 2006, the day prior to her death, Tamiko spent the entire day with friends and family.  Coston spent the morning and afternoon with Tamiko at Tamiko's mother's home.  (TT, 5/15/07, 15).  Coston testified that Tamiko received several calls to her cell phone from petitioner that day and the calls appeared to scare her.  (TT, 5/15/07, 15-18, 20).

Belynda Black (Black), another long-time friend of Tamiko's, testified that she saw Tamiko during the early evening hours on August 9, 2006.  (TT, 5/15/07, 99-100).  At approximately 7:00 p.m., Tamiko received a call from petitioner.  (TT, 5/15/07, 101).  Tamiko then began looking around frantically and stated that she saw petitioner; at that point, Black testified that she saw a white SUV.  (TT, 5/15/07, 102-103).  Soon after, Tamiko and Black went to a local Popeye's chicken restaurant, where Black saw the white SUV that petitioner was driving in the parking lot.  (TT, 5/15/07, 104-105).  Petitioner phoned Tamiko again moments later.  (TT, 5/15/07, 105-106).

Later, inside Black's car, while Black and Tamiko were speaking, Tamiko's phone rang at least ten times; they were all calls from petitioner. (TT, 5/15/07, 109).  Tamiko physically broke down after receiving the repeated calls.  (TT, 5/15/07, 110-111).  Soon after, Tamiko received a text from petitioner that said, "Until the day you die, you will always be Mrs.

Tamiko Baker."   (TT, 5/15/07, 115-116).   Just then, the white SUV pulled into the lot where Tamiko and Black were parked.   (TT, 5/15/07, 117).   Petitioner's white SUV was seen multiple times throughout the day at locations where Tamiko was found.  (TT, 5/15/07, 26-27; see also 5/17/07, 217-219).

Later that evening, Tamiko went to 5074 Buckingham where Terrance Sargent (Sargent) lived.   (TT, 5/15/07, 24; see also 5/16/07, 67).   Tamiko had been dating Sargent for a few weeks.   (TT, 5/16/07, 67).   After about an hour, Tamiko walked to Nino's, a nearby party store.   (TT, 5/15/07, 24).   Coston said that about that same time she saw petitioner's car.   (TT, 5/15/07, 29).   When she returned, Tamiko told her friends that while she was at the store, her husband, the petitioner, had begged her on bended knee to take him back.   (TT, 5/15/07, 29).   She said she had told him to stop embarrassing her.   (TT, 5/15/07, 30-23; see also 5/16/07, 71).   Her statements prompted Sargent to storm down to the store.   He went inside and starting ranting because he felt petitioner had no right to be following Tamiko.   (TT, 5/16/07, 72-74, 104).   When he returned, Tamiko told him that petitioner had called, knew that Sargent had been to the store, and told her to watch her back.   (TT, 5/15/07, 36-37; see also 5/16/07, 75).

A few minutes later a fight broke out between Sargent's brother, his friends, and some of the neighbors.   (TT, 5/15/07, 43-44).   Sargent, Tamiko, and possibly Coston, were in the street trying to break up the fight.   (TT, 5/15/07, 47; see also 5/16/07, 111).   During the fight, the neighbor's friend,

6

Tayshawn, pulled out a gun.     (TT, 5/16/07, 78; see also 5/17/07, 78). Eventually the fight dissipated and the people involved, as well as those standing there, went their separate ways inside various homes.    (TT, 5/15/07, 58; see also 5/16/07, 79; 5/17/07, 79).         Christy Calhoun, who was with Tayshawn on the night of the incident, testified that she never saw him leave her house after the fight ended.    (TT, 5/17/07, 80-81; see also 5/17/07, 222-224).     Sargent, his brother, and two of his brother's friends, who were involved in the fight, went inside 5074 Buckingham; one of the friends got cleaned up.  (TT, 5/16/07, 58-59).

Coston testified that after the fight ended, she and Tamiko agreed to leave, however, Tamiko stated that she was going to use the restroom before they left.  (TT, 5/15/07, 49-50).     Shortly thereafter, there was a gunshot.  (TT, 5/15/07, 57).     Sargent went outside after checking on his mother and found Tamiko on the ground.  (TT, 5/16/07, 88).     Coston, still sitting in the car, also heard a gunshot.  (TT, 5/15/07, 57).     She walked towards the house, saw Sargent outside bending down and Tamiko bleeding from the head.     (TT, 5/15/07, 57).     Coston had not seen anyone fleeing the scene.  (TT, 5/15/07, 59).

Detroit Police Department (DPD) Officers Joseph Woodall and Duane Thomas were the first officers on the scene.  (TT, 5/16/07, 28, 36).   They both observed Tamiko lying in the driveway of 5074 Buckingham, bleeding from the head.  (TT, 5/16/07, 28-29, 37).    When EMS arrived, they were unable to

7

revive her.   (TT, 5/16/07, 29).   Officer Eugene Fitzhugh found two freshly
smoked cigarettes and located Tamiko's cell phone, which were all found
near her body.   (TT, 5/16/07, 136).   Sergeant William Anderson of the DPD
testified that at 12:36am, just prior to Tamiko's death, she received a text
from petitioner that stated, "I can see you with all those guys in front of the
house."   (TT, 5/17/07, 140).   The police testified that between 12:11 a.m. on
August 9th and 3:01 a.m. on August 10th (the day Tamiko was killed),
petitioner called Tamiko 39 times.   (TT, 5/15/07, 139).   Tamiko received
another text from petitioner at 3:07 am that read, "I love you Mrs. Tamiko
Baker."  (TT, 5/17/07, 140).

Prosecution witness Theodore Brown (Brown) testified that he was
located approximately two blocks away from Nino's party store on the night of
the shooting.   (TT, 5/17/07, 8-9).   He and his friend were walking to the party
store in order to buy a blunt.   (TT, 5/17/07, 10-11).   Brown testified that as he
and his friend were walking to the store, he heard a loud sound that he
initially thought was a firecracker.   (TT, 5/17/07, 12-13).   As Brown was
passing an alley, he saw petitioner emerge and he also saw a handle of a
gun sticking out of petitioner's pants near where he was fidgeting with his
waistband. (TT, 5/17/07, 14-15).

Brown testified that he looked at petitioner no less than three times,
knew who he was, saw a gun handle, and he did it all in an area that was well
lit by streetlights.   (TT, 5/17/07, 15-25).   Brown also stated that after he

passed by him, petitioner walked toward a white SUV that was parked nearby and eventually sped away.  (TT, 5/17/07, 30-33).   Further, Brown picked petitioner out of a photographic lineup.  (TT, 5/17/07, 39-41).   On August 10, 2006, several hours after Tamiko's death, petitioner turned himself in to police.  (TT, 5/21/07, 63).

The prosecution introduced evidence of several instances of prior abuse.   One such incident occurred in Macomb County.   Deputy Steven Hogan from the Macomb County Sheriff's Office testified to a prior instance that occurred around April 7, 2006.   (TT, 5/17/07, 181-184).   Dep. Hogan testified that he observed bruises on Tamiko's left eye, neck, chest area, and right leg, as well as blood coming out of her ear.  (TT, 5/17/07, 185, 193, 199-200).   Deputy Anthony Stone further testified that he photographed those injuries.  (TT, 5/17/07, 202-204).

Following the close of proofs, argument of counsel, and the court's instructions, the jury found petitioner guilty on all charges.  (TT, 5/21/07, 176-177).   On June 7, 2007, petitioner was sentenced to life without parole on the first degree premeditated murder conviction, 2-5 years on the felon in possession of a firearm conviction, 5 years on the felony firearm (second) conviction, and 1 year for the stalking conviction.   (Sentencing, 6/7/07, 7). The court ordered that the 5-year felony firearm sentence be served consecutively to any other sentences imposed in the present case. (Sentencing, 6/7/07, 7).

C.    *Standard of Review*

Because petitioner's application was filed after April 24, 1996, his petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (Apr. 24, 1996).   *See Lindh v. Murphy*, 521 U.S. 320, 326-27 (1997).   Amongst other amendments, the AEDPA amended the substantive standards for granting habeas relief by providing:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

"[T]he 'contrary to' and 'unreasonable application' clauses [have] independent meaning." *Williams v. Taylor*, 529 U.S. 362, 405 (2000); *see also*, *Bell v. Cone*, 535 U.S. 685, 694 (2002).   "A state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [this] precedent.'" *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) (per curiam) (quoting *Williams*, 529 U.S. at

10

405-06); *see also*, *Early v. Packer*, 537 U.S. 3, 8 (2002); *Bell*, 535 U.S. at 694. "[T]he 'unreasonable application' prong of § 2254(d)(1) permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts' of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (quoting *Williams*, 529 U.S. at 413); *see also*, *Bell*, 535 U.S. at 694. However, "[i]n order for a federal court to find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous.    The state court's application must have been 'objectively unreasonable.'" *Wiggins*, 539 U.S. at 520-21 (citations omitted); *see also*, *Williams*, 529 U.S. at 409.

By its terms, § 2254(d)(1) limits a federal habeas court's review to a determination of whether the state court's decision comports with "clearly established federal law as determined by the Supreme Court."    Thus, "§ 2254(d)(1) restricts the source of clearly established law to [the Supreme] Court's jurisprudence." *Williams*, 529 U.S. at 412.    Further, the "phrase 'refers to the holdings, as opposed to the dicta, of [the] Court's decisions as of the time of the relevant state-court decision.'    In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003) (citations omitted) (quoting *Williams*, 529 U.S. at 412).

Although "clearly established Federal law as determined by the Supreme Court" is the benchmark for habeas review of a state court decision, the standard set forth in § 2254(d) "does not require citation of [Supreme Court] cases–indeed, it does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early*, 537 U.S. at 8; *see also*, *Mitchell*, 540 U.S. at 16. Further, although the requirements of "clearly established law" are to be determined solely by the holdings of the Supreme Court, the decisions of lower federal courts are useful in assessing the reasonableness of the state court's resolution of an issue. *See Williams v. Bowersox*, 340 F.3d 667, 671 (8th Cir. 2003); *Phoenix v. Matesanz*, 233 F.3d 77, 83 n.3 (1st Cir. 2000); *Dickens v. Jones*, 203 F. Supp.2d 354, 359 (E.D. Mich. 2002) (Tarnow, J.).

D.      *Confrontation (Ground 1)*

### a. Clearly Established Law

The Confrontation Clause of the Sixth Amendment provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right…to be confronted with the witness against him." U.S. CONST. Amend VI. The Confrontation Clause prohibits the admission of out-of-court testimonial statements unless the declarant is unavailable at trial and the defendant had a prior opportunity for cross-examination. *Crawford v. Washington*, 541 U.S. 36, 42 (2004). Michigan Rule of Evidence 804(b)(6), a codification of the common law forfeiture by wrongdoing doctrine, provides an exception to the hearsay rule

12

for a statement by a declarant made unavailable by the opponent.   If the declarant is unavailable as a witness, the rule allows admission of "[a] statement offered against a party that has engaged in or encouraged wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness." MICH. R. EVID. 804(b)(6).   The forfeiture doctrine applies only if a defendant's actions were undertaken for the purpose of preventing the witness from testifying.   *Giles v. California*, 554 U.S. 353, 359 (2008).   Confrontation Clause errors are subject to a harmless error analysis. *Delaware v. Van Arsdale*, 475 U.S. 673, 684 (1986).   To determine whether the trial court's Confrontation Clause error was harmless, the court must examine the following factors: (1) the importance of the witness' testimony to the prosecution's case, (2) whether the testimony was cumulative, (3) the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, (4) the extent of cross-examination otherwise permitted and (5) the overall strength of the prosecution's case. *Van Arsdale*, 475 U.S. at 684.

*b. Analysis*

Petitioner contends that he was denied his Sixth Amendment right to confront the witnesses against him by the admission of Tamiko's April 2006 statement to the police regarding petitioner's acts of domestic violence against her.   The Michigan Court of Appeals agreed with petitioner, but found it "clear beyond a reasonable doubt that a rational jury would have found

13

defendant guilty of the charged offense even without the evidence of the April 6 assault." *Baker*, 2008 WL 4762776, at *2, 3.

Applying the factors set forth in *Van Arsdale*, the court should conclude that the Confrontation Clause error was harmless.   Tamiko's statements to police in April 2006 regarding an instance of abuse were not essential to the prosecutor's case of proving that petitioner was responsible for Tamiko's death in August 2006.   Other evidence was provided to establish the existence of an abusive relationship between petitioner and the victim. Tamiko's mother, Patricia Singleton, testified that her daughter moved out of her home with petitioner and filed for divorce because she was sick of the beatings and abuse.   (TT, 5/16/07, 16-17).   Further, she testified that she heard petitioner threaten the life of her daughter.   (TT, 5/16/07, 18, 20). Additionally, evidence corroborating Tamiko's statements on material points was present.   Deputy Hogan testified that he observed bruises on Tamiko's left eye, neck, chest area, and right leg, as well as blood coming out of her ear.   (TT, 5/17/07, 185, 193, 199-200).   The overall strength of the prosecution's case was not heightened by the inclusion of Tamiko's statements from April 2006.   Other witnesses, including Coston, testified that petitioner repeatedly called and stalked Tamiko the day before her death. The police testified that between 12:11 a.m. on August 9th and 3:01 a.m. August 10th (the day Tamiko was killed), petitioner called Tamiko thirty-nine times.   (TT, 5/17/07, 139).   Brown identified petitioner as the man he saw in

14

the alley walking towards a white SUV with the handle of a gun sticking out of his pants. (TT, 5/17/07, 14-15, 30-33). Accordingly the court should conclude that petitioner is not entitled to habeas relief on this claim.

E.    *Sufficiency of the Evidence (Ground 2)*

*a. Clearly Established Law*

The Due Process Clause of the Fourteenth Amendment "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In Re Winship*, 397 U.S. 358, 364 (1970). Under the pre-AEDPA standard for habeas review of sufficiency of the evidence challenges, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). Reviewing courts must view the evidence, draw inferences and resolve conflicting inferences from the record in favor of the prosecution. *See Neal v. Morris*, 972 F.2d 675, 678 (6th Cir. 1992). In determining the sufficiency of the evidence, the court must give circumstantial evidence the same weight as direct evidence. *See United States v. Farley*, 2 F.3d 645, 650 (6th Cir. 1993); *Scott v. Elo*, 302 F.3d 598, 602 (6th Cir. 2002).

However, under the amended version of §2254(d)(1) a federal habeas court must apply a more deferential standard of review of the state court

15

decision. Thus the question here is whether the Michigan Court of Appeal's application of the *Jackson* standard was reasonable. *See Gomez v. Acevedo*, 106 F.d 192, 198-200 (7th Cir. 1997), *vacated on other grounds sub nom. Gomez v. DeTella*, 522 U.S. 801 (1998); *Restrepo v. DiPaolo*, 1 F. Supp. 2d 103, 106 (D. Mass. 1998).

While a challenge to the sufficiency of the evidence on an established element of an offense raises a federal constitutional claim cognizable in a habeas corpus proceeding, *see Jackson*, 443 U.S. at 324, "[t]he applicability of the reasonable doubt standard … has always been dependent on how a State defines the offense that is charged in any given case." *Patterson v. New York*, 432 U.S. 197, 211 n.12 (1977); *see also, Jackson*, 443 U.S. at 324 n.16; *Mullaney v. Wilbur*, 421 U.S. 684, 691 (1975).   Thus, "[a] federal court must look to state law to determine the elements of the crime."   *Quartararo v. Hanslmaier*, 186 F.3d 91, 97 (2nd Cir. 1999).

Under Michigan law, first degree murder includes "[m]urder perpetrated by means of poison, lying in wait, or any other willful, deliberate, and premeditated killing." MICH. COMP. LAWS § 750.316(1)(a).   Thus the elements of first degree murder are: "(1) the intentional killing of a human being, and (2) that the act of killing was premeditated and deliberate."   *Scott v. Elo*, 302 F.3d 598, 602 (6th Cir. 2002) (citing *People v. Schollaert*, 194 Mich. App. 158, 486 N.W.2d 312, 318 (1992)).

*b. Analysis*

16

In his habeas petition and reply brief, petitioner argues that the prosecution presented insufficient evidence to establish his identify as the shooter.   The Michigan Court of Appeals rejected this claim, reasoning that there was evidence to establish defendant's identity as the person who shot and killed Singleton beyond a reasonable doubt. *Baker*, 2008 WL 4762776, at *1.   This determination was reasonable.   Brown testified that as he was passing an alley, he saw petitioner emerge and he also saw a handle of a gun sticking out of petitioner's pants near where he was fidgeting with his waistband.   (TT, 5/17/07, 14-15).   Further, Brown testified that he looked at petitioner no less than three times, knew who he was, saw a gun handle, and he did it all in an area that was well lit by streetlights.   (TT, 5/17/07, 15-25). The elements of first degree murder under Michigan law, the intentional killing of a human being and that the act of killing was premeditated and deliberate, are apparent through petitioner's conduct.   Petitioner had been spotted throughout the day at locations where Tamiko was at and called her numerous times (TT, 5/15/07, 17-18, 25, 26, 30-37, 104, 108, 110;  TT, 5/17/07, 140). Tamiko had told Sargent that petitioner had called, knew that Sargent had been to the store [to confront him], and told her to watch her back. (TT, 5/15/07, 36-37, TT, 5/15/07 75).   On the day prior to her death, petitioner sent Tamiko a text that stated, "Until the day you die, you will always be Mrs. Tamiko Baker."   (TT, 5/15/07, 115-116). Moreover, petitioner had previous incidences of abuse towards Tamiko.   (TT, 5/16/07, 16-17; see

17

also, 5/17/07, 181-182, 184-185).    Therefore, it is reasonable for the court of appeals to conclude that petitioner exhibited intent to kill Tamiko, and that the killing was premeditated and deliberate.    Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

F.    *Live lineup (Ground 3)*

With respect to petitioner's claim that the circuit court denied his right to a live lineup, this claim is not cognizable on habeas review.    It is well established that habeas corpus is not available to remedy a state court's error in the application of state law.    *See Estelle v. McGuire*, 502 U.S. 6, 67-68 (1991) ("Today, we reemphasize that it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."); *Jackson v. Ylst*, 921 F.2d 882, 885 (9th Cir. 1990) (a federal court on habeas review "ha[s] no authority to review a state's application of its own laws."). Regardless of whether state law conferred on petitioner a right to participate in a lineup, a criminal defendant "enjoys no constitutional right to participate in a corporeal lineup."    *McMillian v. Berghuis*, No. 1:06-cv-057, 2009 WL 3877510, at *25 (W.D. Mich. Nov. 18, 2009); *see also, Morris v. Giurbino*, 162 Fed. Appx. 769, 771 (9th Cir. 2006) ("[T]he United States Supreme Court has never held that a criminal defendant has a constitutional right to a pretrial lineup"); *Reyes v. Slayton*, 341 F. Supp. 926, 927 (W.D. Va. 1972).    Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

G.    *Instructional Error (Ground 4)*

18

*a. Clearly Established Law*

In order for habeas corpus relief to be warranted on the basis of incorrect jury instructions, a petitioner must show more than that the instructions are undesirable, erroneous or universally fundamentally condemned; rather, taken as a whole, they must be so infirm that they render the entire trial fundamentally unfair. *See Estelle v. McGuire*, 502 U.S. 62, 72 (1991); *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977); *Wood v. Marshall*, 790 F.2d 548, 551-52 (6th Cir. 1986); *cf. United States v. Sheffey*, 57 F.3d 1419, 1429-30 (6th Cir. 1995) (standard of review for jury instructions challenged on direct criminal appeal). As the Supreme Court noted in *Estelle*, the Court should "also bear in mind [the Supreme Court's] previous admonition that we 'have defined the category of infractions that violate "fundamental fairness" very narrowly.'" *Estelle*, 502 U.S. at 72-73 (quoting *Dowling v. United States*, 493 U.S. 342, 352 (1990)). If an instruction is ambiguous and not necessarily erroneous, it can run afoul of the Constitution only if there is a reasonable likelihood that the jury has applied the challenged instruction in a way that violates the Constitution. *See Estelle*, 502 U.S. at 72 & 73 n.4; *Boyde v. California*, 494 U.S. 370, 380 (1990). Nonetheless, instructional errors of state law will rarely form the basis for federal habeas corpus relief. *See Estelle*, 502 U.S. at 71-72.

*b. Analysis*

Petitioner claims that he was entitled to a specific instruction on due

19

diligence, when the prosecution failed to produce two witnesses for trial, pursuant to *People v. Eccles*, 260 Mich. App. 379, 389, 677 N.W.2d 76 (2004). The Michigan Court of Appeals rejected this claim, explaining that the trial court conducted a due diligence hearing, and that the evidence showed that reasonable efforts were made to locate the witnesses and secure their presence. *Baker*, 2008 WL 4762776, at *5. At the due diligence hearing, Officer Wolff testified that he attempted to subpoena Antoine Owens by leaving the subpoena at the back door of a house on Cadieux Road on May 2, 2006. (TT, 5/21/07, 18-19). Officer Wolff also left a subpoena for Christopher Calhoun at the door of his grandmother's house on Buckingham. (TT, 5/21/07, 20). At that time, Office Wolff was informed that the Calhouns had moved and tried to go to a second address but it was not valid. (TT, 5/21/07, 20). Officer Thomas testified that on May 17, 2006, he went to a location Christopher Calhoun frequented but was unable to locate him. (TT, 5/21/07, 46-47). In addition, evidence was presented that both witnesses appeared to be avoiding the authorities, and that Antoine Owens had a warrant for a probation violation. (TT, 5/21/07, 20, 40). In light of this testimony, the Court should conclude that the court of appeals determination that a due diligence instruction was not warranted was reasonable. Further, there is no clearly established Supreme Court precedent, as required for relief to be warranted under §2254(d)(1), which reasonably can be read as requiring such instruction. *See Samu v. Elo*, 14 Fed. Appx. 477, 479 (6th Cir.

20

2001) (petitioner not entitled to habeas relief on basis of trial court's failure to give requested instruction where petitioner pointed to no clearly established federal law requiring the giving of such an instruction); *Hanna v. Farmon*, No. 98-56002, 1999 WL 402388, at *2 (9th Cir. June 10, 1999) (same); *Slaughter v. Paker*, 187 F. Supp. 2d 755, 809 (W.D. Ky. 2001) (same); *Rodriguez V. Zavaras*, 42 F. Supp. 2d 1059, 1107 (D. Colo. 1999) (same). Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

## H.   *Recommendation Regarding Certificate of Appealability*

### 1.   *Legal Standard*

As amended by the Antiterrorism and Effective Death Penalty Act, section 2253 provides that a petitioner may not appeal a denial of an application for a writ of habeas corpus unless a judge issues a certificate of appealability.   *See* 28 U.S.C. § 2253(c)(1).   The statute further provides that "[a] certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right."   28 U.S.C. § 2253(c)(2).   As the Sixth Circuit has noted, this language represents a codification of the Supreme Court's decision in *Barefoot v. Estelle*, 463 U.S. 880 (1983), and "[t]he AEDPA thus makes no change to the general showing required to obtain a certificate[.]" *Lyons v. Ohio Adult Parole Auth.*, 105 F.3d 1063, 1073 (6th Cir. 1997); *accord Slack v. McDaniel*, 529 U.S. 473, 483 (2000). Although the statute does not define what constitutes a "substantial showing"

21

of a denial of a constitutional right, the burden on the petitioner is obviously less than the burden for establishing entitlement to the writ; otherwise, a certificate could never issue.    Rather, the courts that have considered the issue have concluded that "'[a] substantial showing requires the applicant to "demonstrate that the issues are debatable among jurists of reason; that a court could resolve the issues (in a different manner); or that the questions are adequate to deserve encouragement to proceed further."'" *Hicks v. Johnson*, 186 F.3d 634, 636 (5th Cir. 1999) (quoting *Drinkard v. Johnson*, 97 F.3d 751, 755 (5th Cir. 1996) (quoting *Barefoot*, 463 U.S. at 893 n.4)); *accord Slack*, 529 U.S. at 483-84.    Although the substantive standard is the same, "[t]he new Act does, however, require that certificates of appealability, unlike the former certificates of probable cause, specify which issues are appealable." *Lyons*, 105 F.3d at 1073. (citing 28 U.S.C. § 2253(c)(3)).

Effective December 1, 2009, the newly created Rule 11 of the Rules Governing Section 2254 Cases in the United States District Courts, 28 U.S.C. foll. § 2254, provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant."    Rule 11(a), 28 U.S.C. foll. § 2254.    The rule tracks § 2253(c)(3)'s requirement that any grant of a certificate of appealability "state the specific issue or issues that satisfy the showing required by § 2253(c)(2)," Rule 11(a), but omits the requirement contained in the pre-amendment version of Federal Rule of Appellate Procedure 22(b)(1) that the court explain "why a certificate should

22

not issue." FED. R. APP. P. 22(b)(1) (version effective prior to 2009 amendment); *see id.*, advisory committee note, 2009 amendments. In light of the new Rule 11 requirement that the Court either grant or deny the certificate of appealability at the time of its final adverse order, I include a recommendation regarding the certificate of appealability issue here.

      2.   *Analysis*

If the Court accepts my recommendation on the merits, the Court should also deny petitioner a certificate of appealability, for the reasons explained above. Resolution of petitioner's confrontation claim is not reasonably debatable in light of the fact that any error was clearly harmless given that the police officer's, victim's mother, and friend's testimony paralleled the victim's statements regarding petitioner's prior instances of abuse towards the victim. In light of witness testimony placing petitioner with a gun near where the victim was killed, and testimony as to petitioner's stalking and prior abusive behavior towards the victim, the resolution of petitioner's sufficiency of the evidence claim is not reasonably debatable. Likewise, for the reasons explained above petitioner's denial of a live lineup claim fails to raise a substantial showing of a denial of petitioner's constitutional rights. Because a due diligence hearing was held and reasonably decided, and in light of the fact that there is no constitutional right to a due diligence jury instruction, the resolution of petitioner's instructional error claim is not reasonably debatable. Accordingly, the Court should

23

conclude that petitioner is not entitled to a certificate of appealability.

G.     *Conclusion*

In view of the foregoing, the Court should conclude that the state courts' resolution of petitioner's claims did not result in a decision which was contrary to, or which involved an unreasonable application of, clearly established federal law.     Accordingly, the Court should deny petitioner's application for the writ of habeas corpus.

III.     <u>NOTICE TO PARTIES REGARDING OBJECTIONS</u>:

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in FED. R. CIV. P. 72(b)(2).   Failure to file specific objections constitutes a waiver of any further right of appeal.   *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).   Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.   *See Willis v. Secretary of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991). *Smith v. Detroit Federation of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).   Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within fourteen (14) days of service of any objecting party's timely filed

24

objections, the opposing party may file a response.    The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court.    The response shall address specifically, and in the same order raised, each issue contained within the objections.


                                                          s/Paul J. Komives
                                                          PAUL J. KOMIVES
                                                          UNITED STATES MAGISTRATE JUDGE

Dated: ___2/8/11


_____

The undersigned certifies that a copy of the foregoing order was served on the attorneys of record and  by electronic means or U.S. Mail on February 8, 2011.

                                s/Eddrey Butts
                                Case Manager